Edgar **RUSSELL** et al., Plaintiffs,

v.

The **AMERICAN TOBACCO COMPANY** and Local 192, Tobacco Workers' International Union, an affiliate of AFL–CIO, Defendants.

No. C–2–G–68.

United States District Court,
M. D. North Carolina,
Greensboro Division.

Jan. 18, 1973.

J. LeVonne Chambers and Robert Belton, Charlotte, N. C., for plaintiffs.

Charles T. Hagan, Jr., and Daniel W. Fouts, Greensboro, N. C., for defendant The American Tobacco Co.

Julius J. Gwyn, Reidsville, N. C., for Union.

## MEMORANDUM OPINION

GORDON, Chief Judge.

This action was instituted pursuant to the provisions of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e et seq. The purpose of the action is to enjoin the defendants from alleged violation of the Act as well as to secure certain affirmative relief for the plaintiffs, and their class, as a result of prior alleged violations of the Act.

Messrs. Edgar Russell, Frederick Broadnax, Alvis Motley, Jr., James R. Vaughn, Lawrence Price, Jr., Glen A. Lee, Haywood Gilliam and James R. Kaylor are Negro citizens of the United States and residents of Reidsville, North Carolina. Messrs. Edgar Russell, Frederick Broadnax, Alvis Motley, Jr., James R. Vaughn, Lawrence Price and Glen A. Lee are employed by the defendant The American Tobacco Company (Company) at its Reidsville Branch in Reidsville, North Carolina. Messrs. Haywood Gilliam and James R. Kaylor are employed by the defendant Company at its Rockingham County Leaf Operation. All are members in good standing of defendant Local Union 192, Tobacco Workers' International Union, AFL–CIO.

Defendant Company is a corporation organized and existing under the laws of the State of New Jersey. The Company operates facilities for the handling and processing of leaf tobacco and the manufacturing of cigarettes in the City of Reidsville and in Rockingham County, North Carolina. The Company is an employer in an industry affecting commerce within the meaning of Section 701(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

The defendant Local 192, Tobacco Workers' International Union, AFL–CIO (Local) is a labor organization representing hourly paid employees of the Company in dealing and negotiating with the Company concerning terms, conditions, and privileges of employment of employees of the Company. The Local is a labor organization within the

meaning of Section 701(d) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d).

The Company operates a plant in Reidsville, North Carolina, and one in Rockingham County, North Carolina, at which plants it conducts two major operations. More particularly, these are:

(a) The Reidsville branch of The American Tobacco Company (Branch) which receives tobacco from the Leaf Department, blends, processes and manufacturers it in its filter and non-filter cigarettes for sale to the general public.

(b) The Reidsville Leaf Department of The American Tobacco Company located outside the corporate limits of the City of Reidsville but within Rockingham County (Leaf), which handles green leaf tobacco, such as burley, bright, Maryland, etc., processes and stores it until needed in Branch. Leaf also handles Turkish tobacco.

The departments or areas of employment utilized by the Company in its Branch operations are:

(a) *Fabrication*: Where cigarettes are made and packed, filters for cigarettes are made and where cigarettes are stored. The shipping and receiving operations are classified under fabrication; and

(b) *Pre-fabrication*: Where tobacco is received, conditioned, blended, cut and dried until needed in Fabrication.

The departments or areas of employment utilized by the Company in its Leaf operations are:

(a) *Stemming*: Where green leaf tobacco is first received, processed and handled;

(b) *Storage*: Where tobacco is stored until needed;

(c) *Blending*: Where tobacco is initially blended according to the brand of cigarettes to be produced; and

(d) *Turkish*: Which handles its special type of tobacco.

Employees in the Leaf department are classified as either regular employees or seasonal employees. Regular employees are employed on a year round basis. Seasonal employees are employed on a seasonal or temporary basis, usually from July to January of the following year.

Craft jobs such as electrician, machinist, tinsmith, welder, etc., are jobs classified in Fabrication although employees in these categories might perform duties in Fabrication and Pre-fabrication.

## JURISDICTION

By order filed January 20, 1971, motions to dismiss filed by the defendants on the ground that the action was not timely instituted, as well as upon the ground that there was a variance between the allegations contained in the complaint and the charges filed by the plaintiffs with the Equal Employment Opportunity Commission (EEOC or Commission), were denied. A complete recapitulation of that order at this point would serve no purpose. However, suffice it so say that although it is important that the parties defendant be named in the charge lodged with the EEOC, Mickel v. S. C. State Employment Service, 377 F.2d 239 (4th Cir. 1967), cert. denied, 389 U.S. 877, 88 S. Ct. 177, 19 L.Ed.2d 166 (1967), and that grievances be set out so that EEOC investigators can ascertain their substance, the specificity associated with legal expertise is unnecessary. When the charge provides a general notice of the situation, a subsequent court action may include those issues which grow out of or are reasonably related to the Commission's investigation. Sciaraffa v. Oxford Paper Co., 310 F.Supp. 891, 898 (D.Me.1970); Younger v. Glamorgan Pipe and Foundry Co., 310 F.Supp. 195 (W.D.Va.1969); Logan v. General Fire-

proofing Co., 309 F.Supp. 1096 (W.D.N. C.1969).

■ The gist of plaintiff Russell's letter to the EEOC was that for some time, allegedly, the Company had discriminated by reason of race in the promotion and transfer of black employees, specifically in two departments and that Local 192 had acquiesced in this conduct. This notice is sufficient to encompass the issues raised by the evidence.

In its earlier order, the Court reaffirmed, as it does here, the interpretation of the Civil Rights Act of 1964 which requires that suit be brought within thirty days of receiving the EEOC cause letter. Goodman v. City Products Corp., Ben Franklin Division, 425 F.2d 702 (6th Cir. 1970). As stated in the earlier order, although the others might be precluded from maintaining individual actions by reason of the time limitation, they are included in the class of black employees of the Company, represented by the plaintiffs, James Kaylor, Edgar Russell, and Haywood Gilliam. Russell as an employee of the Branch operation has standing to represent similarly situated persons, while Kaylor and Gilliam, as employees of the Leaf operation of the Company have standing to represent other persons similarly situated.

Russell's letter of July 26, 1967, to the EEOC specifically charged an acquiescence by Local 192 in the discrimination allegedly committed by the Company. Russell, as a member in good standing of Local 192, has standing in this action to represent the class of all other blacks who are members of Local 192.

Local 192 relies originally on the contention that the charging letter not being under oath by Russell, jurisdiction has never been established for the EEOC to act or for this Court to subsequently hear this action. The statute conferring jurisdiction, 42 U.S.C.A. § 2000e–5(a), does contain the words, "Whenever it is charged in writing under oath by a person claiming to be aggrieved, . . ." The defendant Local 192 relies heavily on the words, "under oath," contending they are jurisdictional in nature. However, these words have been held to have an administrative meaning. "When the statute is thus considered, it is clear that the requirement for verification of charges lodged with the Commission relates solely to the administrative rather than to the judicial features of the statute." Choate v. Caterpillar Tractor Co., 402 F.2d 357, 359 (7th Cir. 1968). Verification of the statement is required by the EEOC for its protection, not for the protection of the Court.

"If the Commission undertakes to process a charge which is not 'under oath', we perceive no reason why the district court should not treat the omission of the oath as a permissive waiver by the Commission. To deny relief under these circumstances would be a meaningless triumph of form over substance." Choate, supra, at 360.

■ The Commission's decision to act on and process an unsigned letter alleging discrimination constitutes a waiver of the "under oath" verification requirement. McGriff v. A. O. Smith Corporation, 51 F.R.D. 479 (D.S.C.1971).

■ In the same jurisdictional vein, Local 192 maintains that a failure by the EEOC to serve a copy of the charge, tendered by the plaintiff Russell, on Local 192 destroys the viability of this action. The Local cites Long v. Georgia Kraft Co., et al, 1 FEP Cases 719 (N.D.Ga.1969) for the proposition that while it may be conceded that actual conciliation by the EEOC need not be conducted, the opportunity for conciliation has been held to be essential. The Local urges the view that it never received statutory notice of the charge filed by Edgar Russell, and was therefore unprepared to defend itself against any such charge.

This jurisdictional defense is almost entirely lacking in substance. Local 192 has plucked one isolated case from a veritable thicket of contradictory cases to

bolster its assertion. Elucidation is found in Holliday v. Railway Express Company, Inc., 306 F.Supp. 898, 901 (N.D.Ga.1969).

"Third, the failure of the Commission to supply respondents with a copy of the charges should not be a fatal bar to private action in federal court. Mondy v. Crown Zellerbach Corp., 271 F.Supp. 258 (E.D.La.1967), rev'd on other grounds, . . . International Brotherhood of Electrical Workers Local Union No. 5 v. United States EEOC, 398 F.2d 248 (3d Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed.2d 565, reversing 283 F. Supp. 769 (W.D.Pa.1967). One judge in this district has held to the contrary. Long v. Georgia Kraft Co., 71 LRRM 2016 (N.D.Ga.1969); Long v. Georgia Kraft Co., 71 LRRM 2018 (N.D.Ga.1969), in two holdings with which this Court must respectfully disagree. There are but a few jurisdictional prerequisites to suit, among which are a charge properly filed with the Commission against the parties named in the civil suit, and receipt by the complainant of statutory notice that the Commission has been unable to secure voluntary compliance through conciliation, followed by a filing within 30 days. Mickel v. South Carolina State Employment Service, 377 F.2d 239 (4th Cir. 1967), cert. denied, 389 U.S. 877, 88 S.Ct. 177, 19 L.Ed.2d 166; . . . Choate v. Caterpillar Tractor Co., 402 F.2d 357 (7th Cir. 1968)."

It is found that the "opportunity to conciliate," for which Local 192 pleads, is the opportunity for the EEOC to exercise its powers. Penalizing the plaintiff because of a failure by the EEOC to exercise its statutory duty is legally unacceptable. Tippett v. Liggett & Myers Tobacco Company, 316 F.Supp. 292 (M. D.N.C.1970); Younger v. Glamorgan Pipe and Foundry Company, *supra*; Choate v. Caterpillar Tractor Co., *supra*.

It is concluded as a matter of law that even if there were a failure by the EEOC in the instant case to present Local 192 with a copy of the charge filed by the plaintiff, Edgar Russell, such fact has no bearing on the facts establishing jurisdiction in this case.

Further, Local 192 contends that since the collective bargaining agreement was negotiated by a tripartite union board made up of the Reidsville, Durham, North Carolina, and Richmond, Virginia locals, the other locals are indispensable parties. This issue was decided adversely to the Union's contentions on January 20, 1971, at which time this Court granted permission to the other locals to intervene if they felt their rights were being threatened. This case in its present form does not suffer from a nonjoinder of parties defendant.

## CLASS OF AFFECTED EMPLOYEES.

By Order entered April 10, 1969, the Court held this to be a proper class action in the following language:

"IT IS, THEREFORE, ORDERED that the plaintiffs may prosecute this proceeding as a class action pursuant to Rule 23(a), (b)(2) of the Federal Rules of Civil Procedure. Since this proceeding falls within the provisions of Rule 23(b)(2), no notice to members of the class need be given at this time.

"The Court further finds and hereby orders that the class here involved are all Negroes who are employed by the defendant company at its Reidsville plant and who might subsequently be employed by the defendant company at its Reidsville plant and who are affected by any racially discriminatory policies or practices of the defendant company and defendant union at the Reidsville plant, should the Court find any such practices in the defendant company's plant in Reidsville, North Carolina. The Court further finds that the class also consists of Negroes who have not applied at the defendants Reidsville plant because of any racially discriminatory practices, if the Court finds any such practices to exist.

"This ruling is conditional and may be amended, modified or altered at any time prior to final determination of this cause on the merits."

Pursuant to this conditional Order, and the findings made herein, the class applicability is modified to some extent.

The defendant Company maintains separate lines of seniority in its Branch and in its Leaf Department. However, these two operations are completely separate and distinct operations. In view of the physical distance between the two facilities, the difference in the types of work done at the two facilities, and the efficiencies derived by keeping the two operations separate and distinct, it is found that the two lines of seniority should not be merged and that there is no justification in law or in fact for merging the two lines of seniority.

Having found that there is no basis in fact or law for merging the lines of seniority at Branch and Leaf, it is found that there has been no discriminatory hiring at Leaf. Because of the equality of opportunity to be hired either at Branch or Leaf, blacks who work at Leaf would be excluded from the class, except for the finding that promotion to supervisory levels at Leaf has been administered in a discriminatory fashion. The class shall include those blacks at Leaf who have been discriminated against because of the supervisory selection process. In so doing, any contention that Branch and Leaf are nothing more than two departments in the American Tobacco Company is specifically rejected.

The class of affected employees at Branch is defined as all black persons employed by the American Tobacco Company at Branch prior to January 1, 1955, and who continued to be so employed between July 2, 1965, and May 27, 1968, and who were denied a promotion in preference to a junior (in point of employment date seniority) white employee because of the criterion of "qualifications" used in selecting persons for promotion between 1963 and May 27, 1968.

There was no hiring between 1955 and 1965 at Branch. Black persons hired since 1965 are not affected by the use of the "qualifications" criterion because they are junior to all the other employees, white and black, and could not have advanced even if the Company had promoted on straight employment date seniority.

The class must also include black machine operators who were bumped back from their jobs because they had not reached the prevailing rate after the Company made the thirty-five day prevailing rate proposal to representatives of the three eastern locals in October, 1968. This segment of the class will be limited to those machine operators who had worked on the machines thirty-five days before being pushed back.

SENIORITY SYSTEM

Prior to October, 1963, hourly paid employees of the Company were represented by racially segregated local unions. The defendant Local was the bargaining agent for white employees in jobs under its jurisdiction in Leaf and Branch. Jobs in Fabrication were filled predominantly by whites and thus came under the jurisdiction of the defendant Local; jobs in Pre-fabrication were filled predominantly by blacks.

At all times material to this action all of the Company's regular employees, Leaf and Branch, were covered by a single collective bargaining agreement and all of the Company's seasonal employees were covered under a separate labor agreement.

In the late 1950's the Company, due to modernization and automation, eliminated approximately thirty jobs in Pre-fabrication and the black employees displaced were transferred to jobs previously held by white employees in Fabrication. This movement was temporary, and in accordance with an oral agreement between the Company and the two segregated locals, the blacks who

had been transferred to Fabrication were transferred back to Pre-fabrication.

In October, 1963, the two previously segregated locals merged into the defendant Local 192. Prior to the merger of the locals, promotions were made on the basis of jobs and departmental seniority; employees in Fabrication could only exercise seniority in jobs in Fabrication; jobs in Fabrication constituted one line of seniority and jobs in Pre-fabrication constituted a separate line of seniority.

More specifically, prior to 1963, the Company used a combination of departmental seniority and plant seniority. Departmental seniority was used to determine promotions. Plant seniority was used to govern lay-off and recall. The 1962 Agreement provided only that "all promotions and demotions shall be made in accordance with seniority provided that, in the opinion of management, there is no question as to the qualifications and efficiency of the employee concerned." After the merger of the locals, the defendants established a single line of seniority for Branch, and promotions made within the Branch were made on the basis of seniority and qualifications. This was done in accordance with the 1962 collective bargaining agreement as amended by the agreement dated March 10, 1964. Until late 1966, the selection of personnel to be promoted was accomplished by means of a canvass among the employees from senior to junior until the job or jobs were filled.

Between 1966 and May 27, 1968, permanent promotions within the Branch were made on the basis of seniority and qualifications, but the availability of jobs or job openings was posted on the bulletin boards within the Branch and employees desiring those jobs signed these postings rather than being canvassed.

Beginning May 27, 1968, promotions within the Branch were made on the basis of seniority alone and the criterion of "qualifications" was not used. Job availability was posted on the bulletin boards for signing by persons desiring such jobs.

In May, 1964, approximately ninety employees retired under the Company's early retirement plan. Most, if not all, of these employees were white employees who held jobs of making or packing machine operator. As a result of these retirements, a number of vacancies in pipeline jobs (which have to be manned to produce any cigarettes at all) were created. A number of employees, most if not all of whom were white, were pushed back to lower paying jobs in the pipeline. These employees were given a special classification, sometimes referred to as "Group II" employees. These employees, by virtue of an oral agreement between the Company and the Union, were given the right to return to their former jobs as openings occurred, notwithstanding the fact that transfer back to their former jobs might involve promoting them over black employees having greater plant seniority. All of the Group II employees were ultimately promoted back to his or her old job, a higher paying job, or retired or have declined the offer to return. Of the fifty-one employees in Group II identifiable by the Company, twenty-seven were promoted back to his or her old job or a higher paying job after the effective date of the 1964 Civil Rights Act, July 2, 1965.

█ Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971), cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), roundly condemned any seniority system which, though neutral on its face, serves to perpetuate the effects of past racial discrimination in hiring. A seniority system must be bona fide.

"(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system

which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e–2(h).

The business purpose to be served in the instant case was that personnel who had previously served on making and packing machines would not require training. The Company characterized the pushback as temporary by promising those affected employees that they would return to their jobs in Fabrication as soon as possible. The predominantly white Fabrication side became so because of racially discriminatory hiring which occurred before the 1964 Civil Rights Act. When the character of the work force had to be changed in 1964 and 1965, the proper course of action would have been a permanent pushback, with the most senior employees returning to the Fabrication jobs when they again opened. This would, of course, have disappointed the hopes of those white workers who had attained the more advantageous Fabrication jobs through discriminatory pre-Act hiring. The seniority system cannot be held bona fide simply because it would have kept the morale, and therefore, efficiency, of at least the white employees at a high level.

"However, Title VII guarantees that all employees are entitled to the same expectations regardless of 'race, color, religion, sex, or national origin.' Where some employees now have lower expectations than their co-workers because of the influence of one of these forbidden factors, they are entitled to have their expectations raised even if the expectations of others must be lowered in order to achieve the statutorily mandated equality of opportunity." *Robinson, supra,* at 800.

■ The use of "seniority and qualifications" to return white employees with less seniority to preferred jobs in Branch over more senior blacks, did not constitute a "bona fide" seniority system.

The March 10, 1964, amendment to the 1962 collective bargaining agreement, which has been previously referred to, provided that promotions and demotions would be made without regard to race, color, creed or national origin. The 1962 agreement was further modified by letters of understanding on October 27, 1964, which restated the amendment adopted on March 10, 1964, except that the October 27 amendment added "except as otherwise agreed to by the Company and the appropriate Union local or locals." The effect of the letters of understanding was purportedly to disestablish departmental seniority in Branch, and to establish a single line of seniority for Leaf.

Several black employees were promoted to positions in Fabrication between 1965 and 1968 as a result of the letters of understanding executed on October 27, 1964. However, a number of black employees were placed back in their old positions during this time because they had not reached the prevailing rate, the top pay for the position. Historically the rate progression required twelve months to reach the prevailing rate.

During the course of a meeting between the Company and Local in March, 1968, the Company proposed to modify the prevailing rate and qualification schedule for the positions, among others, of maker, packer, container packer and filter rod machine. The Company's proposal provided that if an employee had worked in a job classification for a period of thirty-five working days, he could receive the prevailing rate for the position as well as exercise his plant seniority for both temporary and permanent cut backs. The Company's position in proposing the thirty-five day provision was that the Company would be able to determine within this period whether an employee had the ability to learn the job. The Local opposed the thirty-five day proposal, apparently because earlier

employees had to work twelve months to reach prevailing rate. The Union, which is predominantly white, found itself in the position of protecting its white members who felt that a reduction in the time to reach prevailing rate unduly burdened them.

■ Generally stated, there may be instances in which discriminatory policies, i. e., those that prefer one choice over another, may not be illegal, but only in the case of a legitimate business necessity. "When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, non-racial business purpose." Local 189, United Papermakers and Paperworkers, AFL–CIO v. U. S., 416 F.2d 980, 989 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 100 (1970).

The evidence has indicated that the thirty-five days to reach prevailing rate as suggested by the Company is adequate for the Company to make a determination of suitability for the job. The decision to reduce prevailing rate period from twelve months to six months instead of thirty-five days resulted from Union pressure.

"Avoidance of union pressure also fails to constitute a legitimate business purpose which can override the adverse racial impact of an otherwise unlawful employment practice. The rights assured by Title VII are not rights which can be bargained away —either by a union, by an employer, or by both acting in concert." Robinson v. Lorillard Corp., *supra*, 444 F.2d at 799.

There is not a sufficient showing of a business necessity to justify the discrimination which resulted from reducing the period to reach prevailing rate from twelve months to six months, instead of thirty-five days as proposed by the Company.

## SCREEN TESTING

Plaintiffs contend that the use of screen tests for selections to fill craft positions is discriminatory. Before the screen tests were compiled and their use was instituted, employees in the craft positions, i. e., Schmermund Box adjusters, air conditioning operators, machinists, electrical technicians, and millwrights were hired from outside the Company. Persons trained in the requisite crafts were hired when positions became open.

According to the testimony of Mr. William G. Springs, Chief Engineer, Construction and Maintenance, this practice changed around 1956 when the Branch operation of the Company bought Accuray machines to measure the density of cigarettes through electronic use of nuclear materials. Mr. Springs interviewed and questioned prospective Accuray technicians from among the then presently employed workers at Branch. The positions were filled satisfactorily through use of this "in-house" qualification testing program. Thus was born the screen testing program, which plaintiffs contend constitutes a continuing discriminatory practice.

Section 703(h) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(h) provides as follows:

"[N]or shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin."

The plaintiffs urge upon the Court that the decision in Griggs v. Duke Power Company, 401 U.S. 424,. 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) necessitates a ruling in the instant case that the defendant Company's screen tests are unlawful in their application to black employees. Guidance in delineating the pe-

rimeters of *Griggs, supra,* is found in the words of Mr. Chief Justice Burger, who delivered the opinion of the Court:

"We granted the writ in this case to resolve the question whether an employer is prohibited by the Civil Rights Act of 1964, Title VII, from requiring a high school education or passing of a standardized general intelligence test as a condition of employment in or transfer to jobs when (a) neither standard is shown to be significantly related to successful job performance, (b) both requirements operate to disqualify Negroes at a substantially higher rate than white applicants, and (c) the jobs in question formerly had been filled only by white employees as part of a long-standing practice of giving preference to whites." *Griggs, supra,* at 426, 91 S.Ct. at 851.

*Griggs* is doubly distinguishable from the instant case in that this Court is not now concerned with the requirement of a high school education or the passing of a general intelligence test, nor have the plaintiffs shown that the present requirements operate to disqualify Negroes at a substantially higher rate than whites.

■ The figures relevant to the craft positions at the time of the taking of depositions in 1969 reveal that of fifty-nine craft positions, none were held by Negroes. The Company cannot and does not contest these raw statistics. Theirs is not so to do. The burden of proof rests squarely with the plaintiff to show some discriminatory effect from a test requirement before the Court need consider the issue of job relatedness. Broussard v. Schlumberger Well Services, 315 F.Supp. 506, 512 (S.D.Tex. 1970) held the following:

"Plaintiffs argue for what, in effect, amounts to a *per se* rule that the use of a test that has not been professionally validated as to job relatedness is a discriminatory practice. . . . However, in the absence of a showing of a discriminatory effect of the test-

ing requirement upon Negroes as a class any further discussion of job relatedness would be fruitless."

United States v. H. K. Porter Company, 296 F.Supp. 40, 76, 77 (N.D.Ala. 1968) held:

"For a court to find racial discrimination in the use of aptitude tests which have not been validated, there should be at least some evidence that the use of an aptitude test which has not been validated has resulted in discrimination and not merely the abstract proposition that test validation is desirable."

The plaintiffs contend that there can be no question that the tests used by the Company operate to exclude Negroes in the sense referred to in *Griggs.* Evidence substantiating such an argument would be of far greater import than the bald assertion.

■ Discriminatory effect is the whole cornerstone to any decision concerning employment practices such as testing requirements. Discussions of business necessity, intent and job relatedness are largely academic in the absence of discriminatory effect.

The plaintiff has produced only raw figures for this Court. There has been no showing of the percentage of blacks or whites who passed or failed the test. There has been no showing that as a result of the institution of written examinations as a condition of job transfers that blacks were excluded from employment opportunities in a disproportionate number of cases over whites. There has been no definitive showing of proportions whatsoever. The burden of proof does not shift to the Company to prove business necessity or job relatedness.

Even so, it is found that the screen tests used by the Company as conditions to transfer to craft positions are job related and valid.

The plaintiffs contend that the EEOC Guidelines interpreting § 703(h) of the 1964 Civil Rights Act are to be followed verbatim by this Court. For support, Griggs v. Duke Power Co., *supra,* 401

U.S. at 433–434, 91 S.Ct. at 854 is cited as follows:

> "The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job related tests. The administrative interpretation of the Act by the enforcing agency is entitled to great deference."

*Griggs, supra,* does command that the EEOC Guidelines be treated deferentially, but the perimeters of this deference are limited by a close reading of *Griggs,* to the requirement that tests be job related. The geometric progression of reasoning by which the plaintiff insists that the tests must have been professionally developed and validated is laudable, if not logical. United States v. H. K. Porter Company, *supra,* 296 F.Supp. at 76, refutes the plaintiffs' contention:

> "If this statute [703(h)] is to be construed as requiring test validation, the important aspect of the matter is not to be able to say that it has been conducted by a professional psychologist but to be satisfied that it has been conducted fairly and properly. Moreover, the Court received the firm impression from hearing the witnesses testify on the subject that because familiarity with the duties of jobs and with the job performance of employees are essential elements in a test validation, a layman having this knowledge and some experience in testing would be qualified to conduct a test validation."

The plaintiff infers that only a trained psychologist or industrial tester can validate a testing program. This might be so if the various types of validity are given their tightest textbook interpretation. However, content validity means nothing more than "a piece of the job." Mr. William G. Springs, who prepared the tests, is intimately familiar with the requirements which each job in the crafts places on its holder. As Chief Engineer, Construction and Maintenance, he is directly responsible for the training and production of employees in the crafts. He knows what is required of an employee and what is required of the job. From careful scrutinization of the tests prepared by Mr. Springs, the Court is convinced that the tests are an accurate measure of the skills required for the job to which each test is oriented. The Court finds that the tests are not in the nature of general intelligence tests, but rather are sharply oriented to the job being tested for. They are job related. The use of screen tests by the Company has not been a discriminatory practice.

 This Court finds from the evidence that the use in the past of the screen tests are not discriminatory. Nevertheless, to prevent future discrimination, the Court enjoins the future use of screen testing by the Company or the use of present lists compiled from previous administrations of the tests. To be used henceforth, such tests must be validated in accordance with the requirements of the "Guidelines of Employee Selection Procedures" published by the United States Equal Employment Opportunity Commission.

Screen testing is a highly complex and technical matter with its attendant administrative intricacies. In this case, there is no question that the tests employed are job related. However, exercising an abundance of caution to assure fairness, the Court adopts the EEOC Guidelines on validation for future validation of tests by the Company. United States v. Jacksonville Terminal Co., 451 F.2d 418, 456 (5th Cir. 1971), held, "Certainly the safest validation method is that which conforms with the EEOC Guidelines 'expressing the will of Congress.'"

## SUPERVISORY PERSONNEL

The Company has the sole authority for the selection of persons for supervisory positions.

The policy of the Company concerning the hiring of supervisory personnel for Branch employment is to hire by qualifi-

cations. The Company obtains its supervisory personnel for the Branch in two different ways. Some employees are promoted from hourly rated jobs to supervisory positions. Other supervisory personnel are hired from without the Company. The Company canvasses colleges in search of suitable trainees for supervisory positions.

There are no written qualifications for foremen employed by the Branch, and persons for such positions are selected by management based upon an applicant's ability to learn the job, his age, his knowledge of the operation, his ability to get along with people, and sufficient educational background to enable him to keep records.

As of January 29, 1968, there were fifty-three persons employed in supervisory positions in Branch. Of these forty-nine were white (thirty-one foremen, eighteen assistant foremen); four Negroes occupied the position of assistant foreman and they were assigned to Prefabrication.

The Leaf Department hires its supervisory personnel by one of two methods. Management of the Leaf Department either promotes an hourly paid employee through the ranks to a supervisory position, or a person is hired from without the Company for a supervisory job after interviews and from applications. The last person hired from without the Company as the result of an application for a supervisory position was in 1965.

The Leaf Department employs both black and white supervisors, and these supervisors have occasion to supervise the work of both black and white employees. The Leaf Department's first black supervisor was promoted to that position in 1957, and he has since retired.

As of January 29, 1968, there were 200 black employees in Leaf (76 regular, 124 seasonal), of which 3 occupied the position of assistant foreman. There were 63 white employees in Leaf (60 regular, 3 seasonal), of which 27 occupied the position of foreman (18) or as-

sistant foreman (9). Since January, 1969, one black assistant foreman has been promoted to the position of foreman.

Plaintiffs contend that the statistical evidence in this case establishes that the Company has engaged in racial discrimination in the hiring and promotion of supervisory personnel. The Company maintains that, statistical evidence notwithstanding, the plaintiffs have failed to show that in any way the Company has discriminated against blacks in the selection of supervisory personnel.

Plaintiffs rely heavily on Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir. 1972), and Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). *Brown, supra,* reiterates the present importance of statistical evidence in establishing patterns of discrimination. In *Brown,* the defendant's lack of objective standards for hiring, pay increases within job classifications, and for promotion from one job to another lost any innocuousness in the face of statistics indicating that race was the only identifiable factor that could explain the disparity between employees. "Elusive, purely subjective standards must give way to objectivity if statistical indicia of discrimination are to be refuted." *Brown, supra,* at 1382.

In *Rowe, supra,* the lack of any written objective criteria to aid supervisors in their recommendations of hourly employees to salaried positions coupled with the absence of safeguards to prevent discriminatory action was cited to the court. There was a holding of discrimination by the court after it considered the above factors in the light of discriminatory statistics. Relief was ordered by the court.

In the instant case, the figures from the Leaf Operation can hardly be surpassed. Of 63 white employees in Leaf (60 regular, 3 seasonal), 27 are foremen. Only 33 regular white employees are not supervisors. Therefore, 45 per cent of all regular whites are supervisors. In considering the same figures for blacks, there are 3 supervisors of 200 black em-

ployees (76 regular, 124 seasonal). Out of 76 blacks, 3 are supervisors. Even figuring it out to one decimal point, only 3.9 per cent of the regular blacks are supervisors. These figures would chafe the conscience of this Court, even if objective criteria were fully in use, which has not been demonstrated. The lack of objective guidelines and written criteria are some indicia of discrimination.

These figures were applicable through January 29, 1968, when depositions were taken. The Company's memorandum states that at the time of trial, there were two black supervisors and seventeen white. These figures are indeed not as damning if taken to mean that $\frac{2}{19}$ or approximately 11% of all supervisors in Leaf are black. However, the number of black and white supervisors must be considered in light of the number of employees of the respective race.

 It is, therefore, held that the Company's Leaf operation has discriminated against blacks in promotion to supervisory positions in violation of the Civil Rights Act of 1964 and a suitable injunction should issue. Formulation of objective criteria for promotion to supervisory positions is hereby mandated.

In the Branch operation, the statistical pattern is different. As of January 29, 1968, Branch had 1408 whites and 232 blacks. There were 49 white supervisors and 4 black supervisors. Blacks made up approximately 14% of the work force and approximately 8% of the supervisory force. These figures do not mandate a finding of discrimination in promotion to supervisory positions in Branch. Here again though, objective criteria for promotion would be desirable.

## FACILITIES

The plaintiffs produced no evidence that there is any segregation by race in respect to toilets, locker rooms, medical facilities, cafeterias and other facilities. On the contrary, there was affirmative evidence that facilities have not been segregated on the basis of race since well before the effective date of the Act. The toilet facilities were integrated in 1961. The cafeteria and medical facilities were integrated in 1962.

## PAY AND CLASSIFICATIONS

The Company does not and has not, since the effective date of the Act, classified certain jobs as "skilled," others as "semi-skilled," and others as "unskilled" insofar as pay and assignments are concerned.

All employees of the Company are paid on the basis of the job classification under which their work is performed in accordance with the rate schedules negotiated between the Company and the Union and there is no distinction in the pay rates or the amount actually paid by reason of the race or color of any employee. Blacks and whites are paid the same amount for the same work.

## EDGAR RUSSELL

An intensive examination of the voluminous evidence compiled at trial pertaining to the many personal complaints of Mr. Russell reveals that most of the complaints are more fiction than truth. A harmonious work relationship with one so easily offended would indeed be difficult. The allegations of racially motivated personal harassment is not established by the record.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under the provisions of Section 706(f) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f).

2. The defendant, The American Tobacco Company, is an employer in an industry affecting commerce within the meaning of Section 701(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

3. Local 192 Tobacco Workers International Union AFL–CIO is a labor organization engaged in an industry affecting commerce within the meaning of

**300**

Sections 701(d), (e), of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e).

4. The plaintiffs have complied with the procedural requirements of Sections 706(a), (d), and (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(a), (d), (e).

5. This action is properly maintained as a class action under Rule 23(a), (b)(2) of the Federal Rules of Civil Procedure. The class is as hereinbefore defined.

6. The use of the criteria "seniority and qualifications" instead of straight employment date seniority by the defendants until May 27, 1968, in promotions and transfers in the Branch operation of the American Tobacco Company in Reidsville, North Carolina, constituted discrimination against members of the affected class and an unlawful employment practice in violation of Sections 703(a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (c).

7. The practice or policy of the defendants in using or acquiescing in the use of a six-months period to reach prevailing rate instead of the thirty-five day period first proposed by the defendant American Tobacco Company in 1968, constitutes discrimination against members of the affected class and an unlawful employment practice in violation of Sections 703(a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (c).

8. The absence of objective criteria to aid in the selection of supervisory personnel in the Leaf operation of American Tobacco Company in Reidsville, North Carolina, has constituted a deprivation of employment opportunities and an unlawful employment practice in violation of Section 703(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a).

9. The use of screen testing by the American Tobacco Company in its Branch operation has constituted neither discrimination nor an unlawful employment practice and the use of such test-ing has comported with Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h). From the time an order is entered, use of screen testing by American Tobacco Company in Reidsville, North Carolina, or of any lists of successful test applicants will constitute discrimination and an unlawful employment practice in violation of 42 U.S.C. § 2000e–2(a), unless and until such time as the screen tests to be used have been professionally validated in accordance with the requirements of the "Guidelines of Employee Selection Procedures" published by the United States Equal Employment Opportunity Commission.

10. Defendants have intentionally engaged in the unlawful employment practices described in Conclusions 6, 7, and 8 above and are intentionally engaging in the unlawful employment practices described in Conclusions 7 and 8, within the meaning of Section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g).

11. None of the unlawful employment practices in Conclusions 6, 7, and 8 above resulted from a bona fide seniority or merit system within the meaning of Section 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h).

12. This Court is authorized by Section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g) to enjoin the discriminatory practices described herein and to order other appropriate affirmative relief in the nature of back pay.

An Order will be entered in accordance with these Findings.

Consistent with these Findings, counsel for the plaintiffs will prepare and present to this Court an appropriate order which shall provide for the implementation in the Reidsville, North Carolina, plant of the defendant Company the proposal by the Company during the 1968 negotiations for a thirty-five day period to reach prevailing rate, where applicable, and in the Rockingham County, North Carolina, Leaf operation of the Company, a system of objective cri-

teria to aid in the selection and promotion of supervisory personnel.

Further, the order will provide that within thirty days after the order counsel for the plaintiffs will submit to the Court suggested methods by which back pay may be computed for each member of the affected class with special attention to instructions that should be given a special master should the Court decide to appoint a special master. The defendants shall have twenty days thereafter in which to file countersuggestions.