528 F. 2d 357
 11 Fair Empl.Prac.Cas. 395,
10 Empl. Prac. Dec. P 10,412
Edgar RUSSELL et al., Appellants,
v.
The AMERICAN TOBACCO CO., and Local 192, Tobacco Workers
International Union, an affiliate, AFL--CIO, Appellees.
United States Equal Employment Opportunity Commission,
Amicus Curiae.
Edgar RUSSELL et al., Appellees,
v.
The AMERICAN TOBACCO CO. et al., Appellants.
 Nos. 74--1650 and 74--1652.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 7, 1975.
Decided Sept. 24, 1975.
Certiorari Denied April 19, 1976.
See 96 S.Ct. 1666, 1667.
 
 Robert Belton, Charlotte, N.C., and O. Peter Sherwood, New York City (Jonathan Wallas, J. LeVonne Chambers, Charlotte, N.C., Jack Greenberg, Morris J. Baller, New York City, Chambers, Stein, Ferguson & Lanning, Charlotte, N.C., on brief) for appellants.
 Charles T. Hagan, Jr., Greensboro, N.C. (Daniel W. Fouts, Adams, Kleemeier, Hagan, Hannah & Fouts, Greensboro, N.C., on brief), for The American Tobacco Co.
 Julius J. Gwyn, Reidsville, N.C. (Gwyn, Gwyn & Morgan, Reidsville, N.C., on brief), for Local 192, Tobacco Workers International Union.
 Margaret C. Poles, Alexandria, Va., Atty., Equal Employment Opportunity Commission (William A. Carey, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, and Beatrice Rosenberg and Charles L. Reischel, Attys., Washington, D.C., on brief), for amicus curiae.
 Before WINTER, BUTZNER and FIELD, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 These appeals involve only a narrow aspect of a class action in which the district court properly granted black employees broad relief under Title VII of the Civil Rights Act of 1964 against the American Tobacco Company and Local 192 of the Tobacco Workers International Union, AFL--CIO. The district court found that at the company's Reidsville, North Carolina, Branch (Branch), the use of departmental seniority, subjective qualifications, and an excessive probationary period for promotions, transfers, pushbacks, and layoffs had unlawfully excluded black employees in the prefabrication department from working in the fabrication department, where better paying jobs had generally been reserved for white employees. Accordingly, the court ordered that these matters be controlled entirely by plant seniority and by a reduced probationary period. It enjoined the use of screening tests not approved by the Equal Employment Opportunity Commission. It found no discrimination in the appointment of supervisors at Branch.
 
 
 2
 The district court also found that at the company's Leaf Department (Leaf) in nearby Rockingham County, there had been discrimination in the choice of supervisors. Therefore, it required objective criteria for selecting supervisors and affirmative action in appointing black employees to those positions. The court awarded back pay for some of the employees at Branch and Leaf. Neither the company nor the employees appeal these provisions of the decree.
 
 
 3
 The district court, 374 F.Supp. 286, ruled that Branch and Leaf are separate operations because they are two miles apart, different work is done at each plant, and it is more efficient for the company to maintain their distinct identities. It concluded that 'there is no justification in law or in fact for merging the two lines of seniority' at Branch and Leaf. The employees have appealed the denial of relief for Leaf employees. They also seek to enlarge the decree's provision for compliance reports. The union has filed a cross-appeal challenging the court's jurisdiction and complaining about the assessment of back pay.
 
 
 4
 For the reasons stated in Part I, we conclude that qualified black Leaf employees should be permitted to fill permanent vacancies in the fabrication department at Branch without sacrificing their company seniority and that they, like the black employees at Branch, are entitled to back pay. In Part II we affirm the court's order for reports. For the reasons stated in Part III, we find no cause for reversal in the union's cross-appeal. Accordingly, with appropriate modifications to provide a remedy for the employees at Leaf, we affirm the district court's decree.
 
 
 5
 * The company's Leaf department receives, processes, and stores both domestic and Turkish tobacco for use at Branch. Its management is separate and independent from Branch's management. Leaf employs 106 regular workers, approximately 69 percent of whom are black, and 127 seasonal workers from July to the following January, 97 percent of whom are black. When this suit was filed in 1968, the average hourly wages were approximately as follows: white Branch employees, $2.90; regular black Leaf employees, $2.50; and seasonal black Leaf employees, $2.36.
 
 
 6
 The Reidsville Branch of the company receives tobacco from Leaf and makes it into cigarettes. Branch is organized into two departments--prefabrication and fabrication. Prefabrication receives tobacco from Leaf and blends, cuts, and dries it. The Fabrication department manufactures filters and cigarettes, and packs, stores, and ships the finished products. Craft employees, such as electricians, tinsmiths, and welders, are classified in fabrication, but they perform duties in prefabrication as well. Some of the black Leaf employees also work at Branch stemming tobacco.
 
 
 7
 The company's regular employees were formerly represented by racially segregated local unions. Local 192 was the bargaining agent for white employees, most of whom worked in Branch's fabrication department. The employees represented by the black union worked primarily in the Leaf department, in the prefabrication department, and as janitors in the fabrication department. Each union, and consequently, for practical purposes, each department, had a separate seniority roster. In October 1963 the racially segregated unions merged because of a directive from the United States Defense Supply Agency, issued pursuant to an executive order. Seasonal employees, however, continued to work under a separate bargaining agreement.
 
 
 8
 The merger, however, did not open the doors of the fabrication department to black employees. The district court found that through various practices both the company and the union discriminatorily preserved jobs in this department for white employees after the enactment of Title VII.
 
 
 9
 We agree with the district court that the seniority rosters of Branch and Leaf should not be merged. For example, it would be wasteful, as the appellants acknowledge, to use a merged seniority system to fill daily vacancies by shuffling employees between the plants. A company is entitled to the efficiencies it derives from maintaining separate departments and seniority rosters if this can be done without discrimination. Cf. United States v. Chesapeake & Ohio Ry Co., 471 F.2d 582, 593 (4th Cir. 1972). But the inappropriateness of merging the seniority lists does not preclude permanent transfers of employees from Leaf to fabrication at Branch without loss of seniority.
 
 
 10
 If Branch and Leaf are both parts of the same operation, this case presents a straightforward application of the well-accepted principle that discriminatory hiring in departments of a business may be remedied by requiring the company to allow transfers between departments, based on plant-wide seniority. See, e.g., Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). The district court found that the company and the union had discriminated against black employees in staffing Branch's fabrication department. Therefore, if Leaf is considered to be another department of the company's cigarette manufacturing operations in the Reidsville area, the remedy for the discrimination found by the district court should include allowing Leaf employees to transfer to the fabrication department without losing their seniority.
 
 
 11
 If, on the other hand, Leaf and Branch are different locations, and if differences in treatment of workers at the different locations are not due to an intention to discriminate, the company's refusal to allow Leaf employees to transfer on the basis of company-wide seniority would not violate the Act. This is so because 42 U.S.C. § 2000e-2(h) provides in part:
 
 
 12
 'Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . ..'
 
 
 13
 Neither the Act nor the EEOC regulations define the statutory term 'employees who work in different locations,' and we deem it unwise to attempt to draft a definition for every situation. It is readily apparent, however, that the labor market is the most important criterion for determining whether a company's employees work in different locations. If the labor for each plant is recruited from different geographical areas, or if one plant requires labor possessing different skills from the labor employed at another company plant, it is obvious that the company cannot draw from the same labor market to man its plants. Under these circumstances, it generally can be said that the employees work at different locations. In contrast, if a company can operate two or more of its plants with employees from the same geographical area who are unskilled or possess the same skills, an applicant for a job can be assigned to an entry level position in either plant. Therefore, these employees, having been hired from the same labor market, would not generally fall within the statutory class of 'employees who work in different locations.'
 
 
 14
 In this case, the company draws from the same labor market for both Leaf and the fabrication department of Branch. The plants are only two miles apart, and employees come from the same geographical area. Moreover, there are entry level positions at both places that require neither particular skills nor experience. There are jobs in fabrication that can be filled just as well by an employee transferring from Leaf as by a person hired off the street or from the prefabrication department.
 
 
 15
 Other facts indicate that the employees at Leaf and Branch do not work at different locations within the meaning of the Act. The two plants constitute a single manufacturing process. All of Leaf's tobacco is used at Branch, and some of Leaf's employees work at Branch. The same office pays all employees, and the same bargaining agreement covers employees at both plants. The company has contractually reserved the right to shift employees from one plant to the other without depriving the transferees of seniority, and it has exercised this right on several occasions. Moreover, a company official testified that the 'best reason and the only reason' for not allowing Leaf employees to initiate transfers to Branch with retention of seniority was the adverse effect on the seniority of Branch employees. But it is now settled that the mandate of Title VII should not be abated because enforcement of the law will frustrate the expectations of employees who have greater departmental but less company seniority than an employee who has been subjected to discrimination. Robinson v. Lorillard Corp., 444 F.2d 791, 800 (4th Cir. 1971).
 
 
 16
 There is another reason why the exemption granted in § 2000e--2(h) is not available to the company. That section contains a proviso that restricts its application to situations where differences in the conditions of employment 'are not the result of an intention to discriminate.' The evidence discloses that for a number of years the company overtly assigned white workers to the fabrication department and black workers to lower paying jobs in prefabrication and Leaf. Though this practice has been discontinued, its discriminatory effect survived the enactment of Title VII because the company prohibited black Leaf employees from seeking transfers to fabrication without forfeiting their seniority. Intentional segregation of the past that is perpetuated by a company's seniority system precludes the company from claiming that its system is bona fide within the meaning of § 2000e--2(h). United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Griggs v. Duke Power Co., 420 F.2d 1225, 1236 (4th Cir. 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 987 (5th Cir. 1969). Supported by the reasoning of these cases, we hold that when present differences in working conditions are remnants of past intentional discrimination, the proviso of § 2000e--2(h) bars a company from defending its employment practices on the ground that its employees 'work in different locations.'
 
 
 17
 The company and the union assert that in any event black seasonal employees at Leaf should be denied relief. These employees, however, perform substantially the same work and are paid at the same rate as many of the regular employees. Some of them work seasonally by choice because they are farmers; others would prefer regular work with the company but have found only seasonal employment available. Many have worked for a sufficient number of seasons to acquire significant company seniority. The record does not support the inference, nor did the district court find, that as a group they are inferior to regular workers.
 
 
 18
 Although the seniority rosters of Leaf and Branch need not be merged, we conclude that regular and seasonal black employees at Leaf who were hired before the company eliminated discrimination at fabrication should be permitted to transfer to that department as permanent vacancies occur in jobs they can perform. Further, they should receive the training for which the qualify. A transferee's new departmental seniority should be computed from his employment seniority date. The class of employees entitled to back pay should also be enlarged to include Leaf employees. We leave to the sound judgment of the district court the definition of the class of Leaf employees entitled to relief and the details of implementing our modification of its decree.
 
 
 19
 Regular and seasonal Leaf employees also seek entry into the prefabrication department, and many seasonal employees seek regular employment in Leaf on the basis of their company seniority. The district court, finding no racial discrimination in hiring at prefabrication and Leaf, denied their requests. We affirm because the Act does not oblige a company to allow black employees to transfer into departments that were always open to black applicants without discrimination. United States v. Chesapeake & Ohio Ry. Co.,471 F.2d 582, 588, 593 (4th Cir. 1972); United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971).
 
 II
 
 20
 The appellants asked the district court to require the company to submit compliance reports for four years, furnishing information on all personnel action affecting members of the class to whom relief had been granted. The district court, however, did not fully grant this request. Instead, it directed the company to maintain records, open to inspection by plaintiffs' counsel, of all action taken pursuant to the decree. The court also required the company to file every six months for two years specific detailed information about appointments to supervisory positions and the tests selected by the company for use in filling craft positions. The court retained jurisdiction to enforce compliance with its order.
 
 
 21
 A district court must necessarily exercise broad discretion in determining what compliance reports are required. In United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the Court established standards for determining whether an injunction should be granted when the defendant ceases its illegal practices after suit has been filed. These standards are the good faith of the company's intent to comply, the effectiveness of its reform, and the character of its past violations. Although Grant differs factually, we believe that it may be adopted to furnish guidance whenever a district court must determine what compliance reports are appropriate.
 
 
 22
 Nothing in the record or in the briefs indicates the company intends to evade the court's decree. Before and after suit was filed, the company took steps to eliminate some of the discriminatory practices that existed in its plants. It has questioned the employees' interpretation of Title VII, but it has not defied the law. We conclude, therefore, that tested by the standards established in Grant, the district court did not abuse its discretion.
 
 III
 
 23
 The union has raised numerous assignments of error. Because the district judge carefully considered each issue and fully stated the reasons for his rulings against the union, our discussion can be brief.
 
 
 24
 Contrary to the union's claim, the requirement of § 2000e--5(b) that a complaint be sworn is not a jurisdictional prerequisite to suit. The requirement 'is directory and technical rather than mandatory and substantive.' Choate v. Caterpillar Tractor Co., 402 F.2d 357, 359 (7th Cir. 1968); accord, Georgia Power Co. v. EEOC, 412 F.2d 462, 466 (5th Cir. 1969).
 
 
 25
 The union's defense that the suit was not timely is refuted by the facts. The Act formerly required a complainant to file suit within 30 days of receiving notice from the EEOC of his right to sue. The record discloses that notice to the plaintiff, Edgar Russell, was mailed in Washington, D.C., on December 5, 1967. Suit was filed on January 5, 1968. The union argues that since 31 days separate December 5 and January 5, and since the record does not show on what day Russell received notice, the suit may have been untimely and should be dismissed. The district court, however, recognized that a person is not charged with receiving a notice in North Carolina on the same day that it is mailed from Washington. See Federal Rules of Civil Procedure 6(e). It properly ruled that the suit was timely.
 
 
 26
 Russell's charge named the union as a respondent, but the EEOC failed to give the union notice of the charge and did not attempt conciliation with it. The union maintains that the EEOC's omission deprived the court of jurisdiction. Similar contentions have frequently been rejected. A Title VII complainant is not charged with the commission's failure to perform its statutory duties. Dent v. St. Louis-San Francisco Ry. Co., 406 F.2d 399 (5th Cir. 1969); Johnson v. Seaboard Air Line R.R. Co., 405 F.2d 645 (4th Cir. 1968).
 
 
 27
 While Russell's charge was not phrased with the specificity of a legal pleading, it adequately explained to the EEOC that both the company and the union discriminated against black employees in job assignments and promotions. Measured by the standards of Graniteville Co. v. EEOC, 438 F.2d 32, 37 (4th Cir. 1971), it provided a sufficient foundation for instituting this class action.
 
 
 28
 The union also challenges Russell's representation of Leaf employees because he works in Branch and his interests might conflict with those of a Leaf employee who has greater seniority. Title VII litigation, though nominally private, has 'heavy overtones of public interest.' Therefore, an individual employee may represent others who are also subject to racial discrimination, even though they work in different departments and the particulars of the discrimination are not identical. Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968). Moreover, Russell's effectiveness belies any notion that Leaf employees were denied the fair and adequate representation of their interests which Federal Rule of Civil Procedure 23(a)(4) seeks to assure.
 
 
 29
 The only other assignment of error warranting discussion is the union's contention that it was erroneously assessed back pay along with the company. The evidence disclosed that many of the discriminatory practices about which the black employees complained were embedded in the bargaining agreement negotiated by the union. Further, it spurned the company's efforts to ameliorate some of the discriminatory terms of the agreements. The union contends, however, that because the black employees did not protest racial discrimination as a grievance and because they attended a meeting at which the current bargaining agreement was unanimously ratified, the district court erred by ordering it to contribute to the award of back pay.
 
 
 30
 Section 2000e--2 of the Act obliges unions, no less than employers, to refrain from unfair employment practices, and § 2000e--5(g) expressly authorizes back pay awards against labor organizations that violate the law. In neither section did Congress absolve a union whose disadvantaged members acquiesced in the unfair conditions of employment, and there are sound reasons why courts should not engraft this exemption on the Act. Unions have long been required to negotiate for all their members without discrimination because of race, and they cannot bargain away the right to fair employment assured by Title VII. Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir. 1971). Moreover, because of 'the realities of entrenched employment discrimination,' a worker need not complain, other than to the EEOC, as a prerequisite to judicial relief. Bing v. Roadway Express, Inc., 485 F.2d 441, 451 (5th Cir. 1973); accord, Hairston v. McLean Trucking Co., 520 F.2d 226, 231 (4th Cir. 1975); but cf. Thornton v. East Texas Motor Freight, 497 F.2d 416, 420 (6th Cir. 1974). We conclude, therefore, that transferring the burden of discrimination from the union, which is charged with eliminating it, to acquiescent members, who suffer from it, would subvert the remedial purpose of the Act.
 
 
 31
 Local 192 also argues that it would be inequitable to assess it for back pay because it is a non-profit organization with meager assets. It suggests that the company can better afford to pay the award. This argument rests on the faulty premise that back pay awards are only compensatory. Though punitive damages are not allowed, the award serves a dual purpose. In addition to compensating employees who have been wronged, the 'reasonably certain prospect' of a back pay award is designed to induce unions, as well as employers, to voluntarily eliminate unfair labor practices. Albermarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Hairston v. McLean Trucking Co., 520 F.2d 226, 231 (4th Cir. 1975). Accordingly, we affirm the district court's award of back pay against the union.
 
 
 32
 The judgment of the district court is affirmed in part and modified in part, and the case is remanded for further proceedings consistent with this opinion. The appellants shall recover from the company and the union their costs of appeal, including a reasonable attorney's fee in an amount to be determined by the district court.