Charles C. CATHEY, Sr., et al.,
Plaintiffs,

v.

JOHNSON MOTOR LINES, INC., a
corporation, et al., Defendants.

Civ. A. No. 72–262.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 20, 1974.

Jonathan P. Wallas and Robert Belton, Chambers, Stein & Ferguson, Charlotte, N. C., for plaintiffs.

H. Morrison Johnston, McCleneghan, Miller, Creasy & Johnston, Charlotte, N. C., for defendant Johnson Motor Lines, Inc.

Francis M. Fletcher, Jr., Harkey, Faggart, Coira & Fletcher, Charlotte, N. C., for defendant Local 71, International Brotherhood of Teamsters.

Roland P. Wilder, Jr., Washington, D. C., for defendant International Brotherhood of Teamsters.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

McMILLAN, District Judge.

This action was tried on October 21–23, 1974, upon allegations of the plaintiffs that the defendants had engaged in policies and practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq..and 42 U.S.C. § 1981 and that certain plaintiffs and class members represented by the plaintiffs had been denied employment opportunities as a result of the racially discriminatory practices of the defendants. The plaintiffs seek injunctive relief to remedy the claimed discrimination and to restore each individual to his "rightful place." Based on the evidence, the Court enters the following Findings of Fact and Conclusions of Law and Order:

### FINDINGS OF FACT

#### A. *Parties*

Plaintiffs herein, Charles C. Cathey, Sr., Jack Dodd, Matthew Walker, James Hill, Jr., and James Cowen, are black citizens of the United States residing in Mecklenburg County, North Carolina. The plaintiffs have brought this case as a class action under Rule 23, Federal Rules of Civil Procedure; a class was previously certified by the Court; and notice to potential class members by publication and direct mailing was ordered and effected. The evidence presented at the trial in this case involved facts relating to a pattern of racial discrimination engaged in by the defendants, the individual claims of the plaintiffs, and evidence concerning the claims of those class members represented by the plaintiffs who have responded to the notice of this case ordered by the Court and who have presented their claims at trial. The rights of certain individuals who requested to be excluded from this action are not affected by the Court's decisions in this case.

Defendant Johnson Motor Lines, Inc. (hereinafter "Johnson" or "the Company") is a North Carolina corporation with its headquarters in Mecklenburg County, North Carolina. Johnson is engaged in the business of interstate trucking and is a common carrier subject to the rules and regulations of the Department of Transportation. Defendant International Brotherhood of Teamsters (hereinafter the "International") is an unincorporated labor organization

with its headquarters in Washington, D. C. Defendant Local 71 of the International Brotherhood of Teamsters (hereinafter "Local 71") is an unincorporated labor organization and is an affiliate and agent of the International.

Johnson is an employer within the meaning of Title VII and the defendant unions are both labor organizations within the meaning of Title VII. The plaintiffs have complied with the administrative and procedural requirements of Title VII and this action is properly before the Court under both 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981.

### B. *Background Facts*

The Mecklenburg County facilities of Johnson (which has been operating in Mecklenburg County since 1945) are divided into five primary departments; Charlotte Terminal, Charlotte Longline, Charlotte Maintenance, Charlotte Office and Special Commodities Division.

The uncontroverted statistical evidence presented at trial is pertinent and compelling.

With respect to Johnson's Charlotte Longline Department:

(a) As of May 12, 1965, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors & Office | 0 | 9 |
| Longline Drivers | 0 | 316 (Including 2 |
| TOTALS | 0 | 325 Indians) |

(b) As of June 30, 1968, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors & Office | 0 | 14 |
| Longline Drivers | 0 | 382 (Including 2 |
| TOTALS | 0 | 396 Indians) |

(c) As of June 30, 1970, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors & Office | 0 | 16 (Including 1 Indian) |
| Longline Drivers | 0 | 374 (Including 2 |
| TOTALS | 0 | 390 Indians) |

(d) As of November 11, 1972, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors & Office | 0 | 18 (Including 1 Indian) |
| Longline Drivers | 22 | 446 (Including 2 |
| TOTALS | 22 | 464 Indians) |

Between July 2, 1965 (the effective date of Title VII) and December 29, 1970 (the date plaintiff Cathey, the first black longline driver in Charlotte, was hired) Johnson hired 148 white longline drivers and no black longline drivers.

Johnson had over-the-road driving vacancies at Charlotte during the period July 2, 1965–January 1, 1974, except for the period August 18, 1969, through August 31, 1970. Johnson did at least for some time period after July 2, 1965, hire black longline drivers in pairs; the Company never had a practice of hiring white longline drivers in pairs.

With respect to Johnson's Charlotte Terminal Department:

(a) As of May 12, 1965, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Office | 0 | 27 |
| Janitor | 2 | 0 |
| Platform | 34 | 40 |
| Local Drivers | 0 | 21 |
| Switchers | 5 | 6 |
| TOTALS | 41 | 94 |

(b) As of June 30, 1968, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors, Office and Sales | 0 | 26 |
| Janitors | 2 | 0 |
| Local Drivers | 1 | 29 |
| Stevedores | 29 | 34 |
| Checkers | 8 | 26 |
| Switchers | 4 | 9 |
| TOTALS | 44 | 124 |

(c) As of June 30, 1970, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors, Sales and Clerical | 0 | 29 |
| Janitors | 1 | 0 |
| Dockworkers | 37 | 62 |
| Switchers | 5 | 8 |
| Local Drivers | 3 | 26 |
| TOTALS | 46 | 125 |

(d) As of November 20, 1972, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors, Sales and Clerical | 0 | 29 |
| Janitors | 1 | 0 |
| Dockworkers | 27 | 25 |
| Checkers | 13 | 39 |
| Switchers | 5 | 10 |
| Local Drivers | 3 | 27 |
| TOTALS | 49 | 130 |

Plaintiff Cathey was Johnson's first black local driver. Cathey became a local driver in April, 1966, shortly after he sought a longline driving job.

With respect to Johnson's Charlotte Maintenance Department:

(a) As of May 12, 1965, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors & Office | 0 | 10 |
| "A" Mechanics | 0 | 22 |
| "B" Mechanics | 0 | 25 |
| Helpers | 0 | 5 |
| Garagemen | 11 | 4 |
| "A" Parts Clerk | 0 | 3 |
| Parts Clerk Helpers | 0 | 2 |
| TOTALS | 11 | 71 |

(b) As of June 30, 1968, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisory & Office | 0 | 11 |
| Others | 15 | 74 |
| TOTALS | 15 | 85 |

(c) As of June 30, 1970, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisory & Office | 0 | 11 |
| "A" Mechanics | 0 | 37 |
| "B" Mechanics | 0 | 18 |
| Mechanics Helpers | 0 | 12 |
| Garagemen | 7 | 10 |
| Tire Department | 10 | 0 |
| Body and Painter | 0 | 1 |
| "A" Parts Clerk | 0 | 4 |
| "B" Parts Clerk | 0 | 1 |
| Parts Department Helper | 0 | 1 |
| TOTALS | 17 | 95 |

(d) As of November 20, 1972, the racial composition of jobs therein was as follows:

| | Blacks | Whites |
|---|---|---|
| Supervisors & Office | 0 | 11 |
| Journeyman Mechanics | 3 | 84 |
| Helpers | 0 | 2 |
| Garagemen | 7 | 10 |
| Steam Cleaning | 0 | 1 |
| Tire Department | 11 | 1 |
| Parts Department | 0 | 8 |
| TOTALS | 21 | 117 |

William Glenn, Jr. was Johnson's first black journeyman mechanic in Charlotte. He obtained the job as a mechanic on July 11, 1972.

Johnson had never employed a black person in its sales force as of January 1, 1974.

There were no black supervisors, foremen, or managers at Johnson's Charlotte facilities prior to February 28, 1974.

Johnson has never employed a black as parts department clerk at its Charlotte facilities.

There have never been any black dispatchers at Johnson's Charlotte operation.

The average gross wages (being defined herein as "gross wages not reduced by business related deductions") paid to full-time longline drivers by Johnson in the calendar years 1966 through 1973 were greater than the average gross wages paid to full-time local drivers, dockworkers, switchers, checkers and garagemen during those calendar years.

Johnson does not normally post notice of vacancies for longline dispatching jobs.

Johnson does not normally post notices for vacancies for supervisory jobs.

At various times since the effective date of Title VII, the Company has utilized the Wonderlic Test and other unvalidated tests. The use of most of these tests was discontinued prior to the filing of this action.

■ The statistics and other evidence demonstrating Johnson's failure to hire blacks for certain jobs during certain time periods after the effective date of Title VII establishes a prima facie case of both past and continuing discrimination on the basis of race in violation of Title VII and 42 U.S.C. § 1981. *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970); Brown v. Gaston County Dyeing Machine Company, 457 F.2d 1377, 1382 (4th Cir. 1972); *United States v. Chesapeake & Ohio Railway Company*, 471 F.2d 582, 586 (4th Cir. 1972); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245 (10th Cir. 1970). See also, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Moreover, Johnson maintains no objective criteria for the selection of supervisory personnel. A. R. Boyles, Jr. testified (Dep. 27–29) that the primary criteria is "experience"; however, there are no written criteria and factors utilized including "ability to work" and "good character". Supervisory vacancies are not posted. Plaintiff Cathey has never been considered for a supervisory job (Dep. of Richardson, 11) even though he is considered a "very good employee" (Dep. of Sims, 33). Given the evidence in this case, the failure of the Company to utilize objective criteria in the selection of supervisors constitutes a violation of Title VII. *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972); *Russell v. American Tobacco Co.*, 374 F.Supp. 286 (M.D.N.C.1973) (pending appeal on issues not here pertinent).

■■ Once a *prima facie* case is established the burden of going forward with the evidence shifts to the defendants who must show that the results of their employment practices are not the product of racial discrimination. *McDonnell Douglas Corp. v. Green, supra; Bradshaw v. Associated Transport, Inc.*, (W.D.N.C. July 26, 1974). In this case, the evidence of racial discrimination has not been rebutted by the defendants in any manner and compels the Court to conclude that Johnson has engaged in a pattern and practice of refusing to hire and promote blacks into the jobs of longline driver, mechanic, salesman and supervisor, because of their race.

Questions of seniority, among others, are controlled by the three pertinent collective bargaining agreements negotiated by the defendants. These are (1) the National Master Freight Agreement and Carolina Freight Council Over-the-Road Supplemental Agreement (hereinafter the "Road contract"), (2) the Na-

tional Master Freight Agreement and Carolina Freight Council City Cartage Supplemental Agreement (hereinafter the "City contract"), and (3) the Carolina Automotive Maintenance Agreement (hereinafter the "Maintenance contract"). The basic Road contract and the City contract are negotiated on a national level. Additions to and amendments to the national contract are made by supplemental agreement between a group of regional trucking companies and a group of regional local Teamster unions. Both Local 71 and Johnson are signatories to the various pertinent contracts. The International, as such, has not signed any of the applicable bargaining agreements; however, the national master freight agreements are negotiated in part by a union negotiating committee which includes International Teamster President, Frank E. Fitzsimmons and other International leaders. The International through its officers and agents is actively involved in collective bargaining with respect to the City and Road contracts. The Maintenance contract is apparently more of local flavor although the International (pursuant to the provisions of the International Constitution) apparently exercises some ultimate control with respect to that contract also.

At the time this action was filed neither the Road contract, City contract or Maintenance contract allowed an employee working under the jurisdiction of one agreement to transfer to a job under the jurisdiction of another agreement and carry with him his total terminal seniority for all purposes. Thus, an employee who was hired in Charlotte by Johnson at a time when Johnson did not hire black longline drivers (i. e. prior to December 29, 1970) and who was working under the City contract was unable to move to a job under the Road contract without forfeiting his accumulated seniority for job bidding and lay-off purposes. Similar restrictive seniority carryover provisions which put "roadblocks" in the way of blacks seeking equal opportunity have been consistently condemned in other cases involving similar issues and facts in the trucking industry. See, e. g. *United States v. Central Motor Lines, Inc.*, 338 F.Supp. 532 (W.D.N.C.1971); *Hairston v. McLean Trucking Co.*, 62 F.R.D. 642 (M.D.N.C. 1974); *Jones v. Lee Way Motor Freight, Inc., supra; Franks v. Bowman Transportation Co.*, 495 F.2d 398 (5th Cir. 1974).

Thus, under the facts of this case, in light of the discriminatory hiring and promotion practices of the Company, the collective bargaining agreements in effect at the time of the filing of the Complaint in this action perpetuated into the present the effects of past discriminatory hiring to the detriment of the plaintiffs. The Court finds that the restrictive seniority provisions in the pertinent agreements were violative of Title VII and 42 U.S.C. § 1981.

In 1973, the contracts in effect at the time of the filing of the Complaint in this action (the Complaint was filed November 17, 1972) expired and new collective bargaining agreements were negotiated. Under the Road contract and City contract effective from 1973 to 1976, employees working under one contract may, during an established time period every year, sign a posting for jobs within the other contract and move from the Road contract to the City contract or from the City contract to the Road contract with their full terminal seniority for all purposes when vacancies occur. Under the present pertinent collective bargaining agreements there still are no provisions for "carryover seniority" out of or into the Maintenance contract.

While the 1973 changes in the seniority provisions in the Road contract and the City contract have made certain relief requested by the plaintiffs unnecessary, the Court must review the contractual situation as of the time this action was filed. See, e. g., *Parham v. Southwestern Bell Telephone Co., supra* at 426 and *Brown v. Gaston County Dyeing Machine Company, supra*. As set forth above, under the facts of this

case, the pertinent collective bargaining agreements, as they existed when this action commenced, constituted a violation of the applicable statutes.

The International has contended throughout these proceedings that it has not been involved in any of the discriminatory hiring and promotion demonstrated herein and that it is not a party to any of the pertinent collective bargaining agreements. As stated above, while the International is not a signatory party to any of the pertinent collective bargaining agreements, International officials play an integral and important role in the negotiation of the national master freight agreements including the seniority provisions at issue here. W. C. Barbee, President of Local 71, testified in his deposition which was admitted into evidence as to the International's role in collective bargaining (p. 20):

> "The International as such, they co-ordinate, or officers of International co-ordinate and participate in some areas or industry-wide agreements."

Local 71 receives monthly dues of $10.00 from its members and pays to the International a per capita assessment of $2.15 per month for each member.

Moreover, the Constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (adopted July, 1971) demonstrates that the International has significant control over the daily business of its local unions including Local 71. Specifically: the Constitution establishes Joint Councils of local unions (Local 71 is in a Joint Council with five other Locals) and four Area Conferences of local unions. All collective bargaining agreements must eventually be submitted to the International for review of the "working conditions or earnings" contained in said agreements. The General Executive Board of the International, if it deems it necessary, can keep a subordinate body (such as a Joint Council or Area Conference) from executing such an agreement. (Constitution, 88–90).

In addition, the General Executive Board maintains the power to remove local union officers for cause.

Thus, the International is deeply involved in the negotiation and approval of collective bargaining agreements and maintains considerable control over local unions. While local unions apparently retain some autonomy, the International maintains a broad, widely-defined supervisory and veto power. If the International had insisted, as it had authority to do purusant to its Constitution, the collective bargaining agreements involved in the case which did not allow carryover seniority from City to Road and which, under the facts of this case, were in violation of Title VII and 42 U. S.C. § 1981 would not have become effective. The International's failure (as well as that of Local 71) to take steps to assist its black members who had been the victims of racial discrimination, makes the International, at least with respect to its ratification of past collective bargaining agreements, a party to violation of the applicable statutes.

▌ Indeed, while neither the International nor Local 71, is engaged in hiring or selecting of supervisory personnel, the results of the company's hiring practices are so blatant that the unions, especially by allowing perpetuation of discrimination in the applicable collective bargaining agreements, have become participants in the Company's discriminatory conduct by means of their "passivity at the negotiating table" *Hairston v. McLean. Trucking Co.*, 62 F.R.D. 642 (M.D.N.C.1974) (fn. 10).

C. *Evidence of Discrimination with Respect to Individuals*

While the Court finds that defendants have engaged in a pattern and practice of racial discrimination, the question with respect to whether or not specific individuals have suffered from the racially discriminatory policies and the proper remedies, if any, depends on the specific facts relating to each individual case. In this light, the Court finds,

with respect to the individuals who claimed they were injured by the defendants' racial discrimination and who testified at trial, as follows:

### 1. *Charles C. Cathey, Sr.*

██ Plaintiff Cathey was employed by Johnson as a switcher under the City contract in December, 1957. In April, 1966, Cathey applied for a longline driving job with the Company. At that time, Cathey qualified to be a longline driver, was not hired as a longline driver, but was hired as Johnson's first black local driver. The Court finds as a fact that Cathey was not hired in April, 1966 as a longline driver because of his race.

In the fall of 1970 Cathey again attempted to get a longline driving job. He was hired as a longline driver effective December 29, 1970, and was the first black hired by Johnson in Charlotte as a longline driver. On the date that Cathey was hired, another black, Oscar Crowder, was also hired as a longline driver to be Cathey's partner.

Cathey testified, and the Court finds as a fact, that during the period of at least 1966 to 1970 the defendant Company had a reputation within the black community of not hiring blacks for higher paying jobs including jobs as over-the-road drivers, mechanics, and supervisory jobs.

When Cathey became an over-the-road driver on December 29, 1970, he forfeited the seniority he had accumulated under the City contract for bidding and layoff purposes for his longline driving job under the Road contract. At the time that the Complaint was filed in this action, Cathey had a Charlotte Road seniority date of December 29, 1970. Pursuant to the seniority carryover changes in the City contract and Road contract effective in 1973 Cathey's seniority was changed to his date of hire at the Charlotte terminal and he is now credited with that seniority date for all purposes.

### 2. *Matthew Walker*

Plaintiff Walker was employed as a local driver by Atlanta-New Orleans Freight Lines (hereinafter referred to as "A & O") on June 21, 1956, at the A & O New Orleans, Louisiana terminal. Johnson assumed control of A & O on or about June 1, 1962. Walker had been employed by A & O and Johnson since 1956.

██ In 1965 Walker asked a Johnson official in New Orleans for an application for an over-the-road driving job. Walker was told that the Company was not hiring blacks for over-the-road jobs because there were no places for blacks to eat or sleep on the road. In March, 1966 Walker asked Gene Fullmer and Howard Johnson, who were at that time Johnson officials in New Orleans, for applications to drive for Johnson over-the-road. At that time, Walker indicated his willingness to drive for Johnson at any of their terminals throughout the Johnson system; however, Walker was not given an application to apply for a longline job. As of March, 1966, Walker had gained driving experience while working for the Dubon Canning Company from 1951 to 1954 driving a tractor trailer similar to those used by Johnson in the Gulf states. He had also gained driving experience with the Coca-Cola Company driving in New Orleans from 1940 to 1944 and again from 1946 to 1950. The Court finds as a fact that Walker was qualified to drive for Johnson in March, 1966 and was denied an opportunity at that time to apply for and obtain a longline job because of his race.

In the summer of 1971 Plaintiff Dodd approached Walker and informed Walker that he needed a partner to go with him to Charlotte to drive as a longline driver. Walker went with Dodd to Charlotte, applied for a longline job, passed all the tests, was hired and presently bears a Charlotte Road seniority date of July 21, 1971.

### 3. *James Hill, Jr.*

█ Plaintiff Hill was employed by Johnson on April 23, 1963, to work as a local driver and checker at their New Orleans, Louisiana, terminal. In March, 1966, Hill spoke with Tommy Claxton, a Johnson official in New Orleans, and asked for an over-the-road driving job. Hill was willing to move to Charlotte or any other Johnson terminal throughout their system in 1966 but was unable to obtain a job at that time. As of March, 1966, Hill had extensive driving experience in the United States Army both during five years of active duty and a number of years of driving with the Army Reserves. His experience included driving with trailer equipment similar to that used by Johnson Motor Lines and included driving from New Orleans to Atlanta and from New Orleans to Army bases in the state of Illinois. The Court finds as a fact that Hill was qualified to drive for Johnson in March, 1966, and was denied a longline driving job at that time because of his race.

In July, 1971, after plaintiffs Dodd and Walker began driving for Johnson out of Charlotte, Hill sought a driving job, went to Charlotte where he passed the pertinent tests, and was hired as a longline driver. He presently bears the Charlotte Road seniority date of August 17, 1971.

### 4. *Jack Dodd*

█ Plaintiff Dodd was hired on December 5, 1964, at Johnson's New Orleans, Louisiana, terminal. He was hired to work under the New Orleans City contract which is similar to the pertinent City contract in this case. During the period that Dodd was working for Johnson in New Orleans (1964–1971), Johnson had no black over-the-road drivers, no black garagemen, no black mechanics, and no blacks working in Johnson's New Orleans office. Dodd worked for Johnson in New Orleans from December 5, 1964, until the summer of 1971. During that period he was laid off several times from his job under the City contract.

In January, 1970, Dodd attempted to get a longline driving job. He spoke to P. F. Richardson and Barry Woods, Johnson officials in New Orleans, on several occasions seeking the opportunity to apply for and obtain a longline driving job. Dodd indicated to Company officials that he was willing to go anywhere within Johnson's system to obtain a driving job. Dodd was unable to obtain a driving job in 1970.

As of January, 1970, Dodd had extensive over-the-road driving experience. He had driven for 17 years with J. S. Frering Grocery, driving tractor-trailer rigs similar to those utilized by Johnson and had travelled extensively throughout Mississippi and Louisiana. Dodd had also gained driving experience while serving in the United States Army in Korea where he drove various vehicles including tractor-trailers in all types of weather. The Court finds as a fact that Dodd was qualified to be an over-the-road driver in January, 1970, and that he was denied the opportunity at that time to apply for and obtain an over-the-road driving job with Johnson because of his race.

In the spring of 1971, Dodd addressed a letter to Johnson Motor Lines' headquarters in Charlotte and again requested an over-the-road driving job. A Johnson official came to New Orleans where he interviewed Dodd, and told Dodd that he would be hired as a road driver in Charlotte if he could find a black partner to come with him to Charlotte. Dodd eventually found a black to accompany him, went to Charlotte in July, 1971, and, after passing all of the necessary tests, began driving for the Company on July 21, 1971. Dodd currently maintains a Charlotte Road seniority date of July 21, 1971.

The experiences of Plaintiffs Walker and Hill in attempting to obtain a longline driving job in early 1966 demonstrates that any such attempt by Dodd would have been futile. The "rules of

the shop" in New Orleans in 1966, as well as the policy in Charlotte where no black longline drivers were hired prior to December, 1970, simply did not allow a black man to be a road driver. See, generally, *Graniteville Co. v. EEOC*, 438 F.2d 32 (4th Cir. 1970)

### 5. *James Cowen*

Plaintiff Cowen began his employment with Johnson in Charlotte on January 5, 1955, as a stevedore or dockworker under the City contract. Between 1955 and 1971 Cowen worked under the City contract as a stevedore, dockworker, and a checker.

Early in 1971, after plaintiff Cathey and Oscar Crowder, another black, obtained road driving jobs with Johnson, Cowen spoke with Charles Sims about his interest in a driving position with Johnson. Sims, after reviewing Cowen's qualifications, preliminarily told Cowen that he did not think Cowen had enough experience to drive for Johnson. Thereafter, Cowen enrolled at the Charlotte Truck Driver Training School where he personally paid $500.00 for a four week truck driving training course. Cowen thereafter graduated from the Charlotte Truck Driver Training School after passing the over-the-road test and other tests administered by the school.

Subsequently, Cowen again made application with Johnson for a longline driving job. As of April, 1971, Cowen had three years of truck driving experience during the years 1945 to 1948 while he was with the United States Army in Europe. During this period he drove tractor trailer equipment similar to that used by Johnson during all seasons of the year and throughout Germany. In addition, during the period January to April 1971 Cowen drove part-time as an over-the-road driver for Guingard Freight Lines.

As of April, 1971, Cowen had passed all of the longline driving requirements required by the Company except for the road tests. The road test utilized by Johnson includes ratings with respect to all categories required by the Department of Transportation and, in addition, additional ratings required specifically by Johnson. Johnson's employees Gray M. Coggins and William Fuller testified with respect to Cowen's performance on road tests administered by them. Coggins administered tests in April, 1971, and July, 1971. Fuller administered a test in September, 1971. Coggins testified that Cowen failed the April, 1971, test in that he failed to check his tractor trailer in a proper manner before and after his test, drove carelessly, recklessly and unprofessionally and generally was unable to handle the equipment. Coggins' testimony with respect to the July, 1971, test and Fuller's testimony with respect to the September, 1971, test was generally that Cowen performed poorly and unsatisfactorily and was unable to handle the equipment in accordance with Johnson's racially neutral requirements.

Cowen testified that he spoke to Luke Murray, a Johnson official, about obtaining a road job and that Murray told Cowen that he would be employed as a road driver as soon as a black partner for Cowen could be found. Cowen did not present a black partner to the Company. The uncontroverted evidence also indicates that Cowen passed road tests at the following trucking companies: Guingard Freight Lines, Pilot Freight Lines, Northwestern Trucking Company, Lloyd Motor Express, Allied Foods and International Freight Lines. Cowen testified that he felt he performed all road tests capably and that the results of the various over-the-road tests administered by Johnson employees Coggins and Fuller were never explained to him. To the contrary, Coggins and Fuller each testified that they explained to Cowen in detail after each test where his performance had been subpar.

While the fact surrounding Cowen's inability to obtain a longline driving job with Johnson raises some serious questions for the Court, especially in light of the Company's hiring history and the "black pairs" policy, the Court

concludes that the testimony of Fuller and Coggins is credible and that Cowen was denied a longline driving job because of his inability to pass Johnson's road tests. The Court finds as a fact that Cowen was not denied a longline driving job by Johnson because of his race.

### 6. *William L. Robinson*

██ Robinson, a member of the class represented by the plaintiffs, applied in Charlotte for a job as a longline driver with Johnson in October, 1971. At that time, Robinson was living in New York City and was working for the United States Post Office. In October, 1971, Robinson filled out a written application for a longline driving job and put on his application both his New York address and telephone number and the address and phone number of his mother who, at that time, lived in Charlotte. Subsequent to filing a written application, Robinson called Johnson several times in late 1971 seeking to find out the status of his application. He was told that the processing of his application had not yet been completed and that the Company would contact him as soon as the application was completed. Robinson did not hear from the Company thereafter. As of October, 1971, Robinson had driving experience with the Post Office as a tractor trailer operator since 1969. He had driven a tractor trailer rig similar to that operated by Johnson throughout New York City and in New Jersey, Connecticut and Pennsylvania in all types of weather.

When Robinson applied for a job in October, 1971, he apparently did not have a black partner who made application with him at that time. The Court finds as a fact that Robinson was qualified to drive as a longline driver for Johnson in October, 1971, and was denied a job at that time because of his race.

In August, 1973, Robinson again applied for an over-the-road driving job with Johnson and was hired and presently holds a Charlotte Road seniority date of October 19, 1973.

### 7. *Ace Drakeford*

██ Drakeford, a member of the class represented by the plaintiffs, spoke to George Lloyd, an official in Johnson's Charlotte Maintenance Department, in November, 1970. At that time Drakeford was seeking a job as a journeyman mechanic with Johnson. As of November, 1970, Johnson had never employed a black journeyman mechanic. Seniority lists introduced at trial show that Johnson had mechanic vacancies in 1970 and 1971.

Lloyd refused to give to Drakeford an application in November, 1970. As of November, 1970, Drakeford had completed a two year course at Central Piedmont Community College in Charlotte in Automotive Mechanics. He had also worked for Justice Auto Service for several months as an auto mechanic and had spent two years from 1967 to 1969 in the United States Army as a helicopter mechanic and a mechanic in the motor pool servicing all kinds of vehicles including tractor trailers. In October, 1969, after receiving an honorable discharge from the Army, Drakeford went to work for Cummins Deisel as a mechanic. While with Cummins, Drakeford worked on the very types of engines utilized in Johnson's tractor trailers. The Court finds as a fact that Drakeford was qualified to be journeyman mechanic in November, 1970, and was denied a job as a mechanic at that time because of his race.

In August, 1972, Drakeford filed an application in Charlotte for a mechanic's job with Johnson. He was hired on December 3, 1972, and bears a Charlotte Maintenance seniority date (as a mechanic) of December 3, 1972.

### 8. *Willie L. Hames*

██ Hames, a class member represented by the plaintiffs, has never been employed by Johnson. In October, 1966, Hames went by the Johnson office in Charlotte and attempted to file an application for an over-the-road driving job. He was not given an application and

was told by an individual who Hames could not name at trial that Johnson was not hiring road drivers at that time.

In April, 1968, Hames again went to the Company's Charlotte office and this time filed a written application seeking an over-the-road driving job. Hames checked back several times with the Company but never heard from Johnson and was never hired as a road driver. In 1971 Hames went to Johnson's Charlotte office and sought to ascertain the status of his application. He never heard again from Johnson. As of 1966 Hames had truck driver experience with the United States Army from 1955 to 1959 driving tractor trailer rigs, similar to those used by Johnson, throughout Germany. He had also driven a dump truck for Kern Brothers for some period of time and drove for Broad River Brick Company from 1962 to 1966 as a tractor trailer driver. In December, 1966, Hames went to work for Concrete Material, passed the Department of Transportation road test and drove tractor trailer rigs for Concrete Material throughout North Carolina, South Carolina, Georgia, Tennessee and Virginia until September, 1971. From September, 1971, until sometime in 1974 Hames drove tractor trailer rigs to Atlanta and Cincinnati from Charlotte for Central Georgia. The Court finds as a fact that Hames was qualified to be a longline driver in April, 1968, and was not hired because of his race.

### 9. John Jackson

 Jackson, a member of the class represented by the plaintiffs, testified that in April or May, 1973, he filled out a written application for a dock job with Johnson and returned the application to Tucker Johnson, a Company supervisor. He testified that Johnson told him he would call him but he was never called and never hired for a dock job.

The uncontroverted statistics demonstrate that Johnson has had blacks working on its docks as stevedores for numerous years. The defendants have

now set up a "preferential list" which is made up of casual (part-time) dockworkers who are offered permanent vacancies as they are available according to the preferential seniority list. It is not clear from the evidence either when the "preferential list" system began or what steps an individual must take to obtain a place on the list.

Tucker Johnson testified that he receives numerous applications and requests for applications and requests for jobs from persons, both black and white, who seek jobs with Johnson as dockworkers. Apparently many persons, both black and white, apply for dock jobs with Johnson and are not hired. Because the statistical data with respect to dockworkers is quite different from that with respect to longline drivers, mechanics, and supervisors and because Jackson has presented no other evidence which would lead to a finding of discrimination on the ground of race, the Court finds as a fact that Jackson was not discriminated against on account of his race by Johnson.

### 10. James Funderburk

Funderburk, a member of the class represented by the plaintiffs, testified that he attempted to get a job as a dockworker with the Company in 1962 and again in 1970. In 1970 he talked with Tucker Johnson, who was then Platform Manager for Johnson and who told James that he could not use him at that time.

Carson Funderburk, the brother of James Funderburk and the brother of William Funderburk, testified that he attempted to help James obtain a dock job and talked with Paul Green and other Johnson employees including Tucker Johnson about hiring both of his brothers. Carson testified that Tucker Johnson once told Carson that the Company did not hire brothers; however, Carson admitted and the Court finds that Johnson had hired both white brothers and black brothers on the dock.

Evaluating all the evidence, the Court concludes that James Funderburk was

not denied a dock job because of his race.

11. *William Funderburk*

William Funderburk, brother of James Funderburk and Carson Funderburk and a member of the class represented by the plaintiffs, testified that he attempted to get a job with Johnson in the summer of 1970 and again in 1972. He stated that he filed an application in 1972 when his brother, Carson, delivered it to Tucker Johnson. William testified that after he filed his application, he heard nothing further from the Company. Under all the facts of this case the Court concludes that William Funderburk was not denied a job because of his race.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action under the provisions of Section 706(f) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f), 42 U.S.C. § 1981 and 28 U.S.C. § 1343.

2. Defendant Johnson Motor Lines, Inc. is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Defendants International Brotherhood of Teamsters and Local 71 thereof are labor organizations within the meaning of 42 U.S.C. § 2000e(d).

4. Plaintiffs herein have complied with the procedural requirements of Section 706(a), 706(d) and 706(e) of Title VII of the Civil Rights Act of 1964. This action is also properly brought pursuant to 42 U.S.C. § 1981 and 28 U.S.C. § 1343.

5. The policy, pattern and practice of the defendant Johnson Motor Lines of excluding black persons, including four of the named plaintiffs and several members of the class which the plaintiffs represent, from certain jobs with the defendant Company including, but not limited to, longline truck driver posi-

tions, journeyman mechanic positions, sales positions, and supervisory and management positions constitutes an unlawful employment practice in violation of Title VII and 42 U.S.C. § 1981.

6. The refusal of the defendant company and the defendant unions to take affirmative action to remedy the present and continuing effects of past and continuing discrimination constitutes a violation by the Company and the Unions of Title VII and 42 U.S.C. § 1981.

7. The pertinent collective bargaining agreements in effect at the time the Complaint was filed in this action and more specifically the restrictive seniority provisions of said agreements limiting seniority carryover from one bargaining agreement to another perpetuated into the present the effects of past discrimination and were in violation of Title VII and 42 U.S.C. § 1981.

8. Plaintiffs Cathey, Dodd, Walker and Hill and class members Drakeford, Robinson, and Hames have each suffered harm as a result of the discriminatory practices of the defendants and are each entitled to such equitable relief as would put them in their "rightful place". See, *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 248, 251–258 (5th Cir. 1974). That is, each individual the Court has found to be a victim of discrimination is entitled to those equitable remedies to restore to him all benefits he would have had but for the racial discrimination practiced by the defendants. Each individual is entitled to monetary damages in the nature of equitable back pay and job placement and seniority adjustment as required by the facts of each individual case.[1]

9. The plaintiffs, having prevailed in this matter, are entitled to

---

1. The record indicates that certain other class members including Roger Brown, Thorny Nash, John Ervin, and Albert Roseboro have claimed that they suffered as a result of the discrimination in this case. The Court understands that the parties have reached agreement with respect to their claims. Therefore, no specific findings with respect to these individuals is necessary.

their costs including reasonable counsel fees, court costs and expenses. *Lea v. Cone Mills Corp.*, 438 F.2d 86 (4th Cir. 1971); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 804 (4th Cir. 1971).

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered that:

1. The Charlotte longline seniority date of Matthew Walker shall be amended to be March 1, 1966. Walker's Company seniority date shall remain June 21, 1956.

2. The Charlotte longline seniority date of James Hill shall be amended to be March 1, 1966. Hill's Company seniority date shall remain as April 23, 1963.

3. The Charlotte longline seniority date of plaintiff Jack Dodd shall be amended to be January 1, 1970. Dodd's Company seniority, by which vacation and fringe benefits are measured, shall remain his original hire date of December 5, 1964.

4. The Charlotte Maintenance seniority date and the Company seniority date of Ace Drakeford shall be amended to be November 1, 1970.

5. The Charlotte longline seniority date and Company seniority date of William L. Robinson shall be amended to be October 1, 1971.

6. The defendant Company is ordered to offer immediately to Willie L. Hames a longline truck driving position with a Charlotte longline seniority date and Company seniority date of March 1, 1968.

7. The parties are directed to confer with respect to the drafting of the "affirmative action plan" to remedy the effects of the past racial discrimination practiced by the defendants. Said plan should include appropriate recruiting and training provisions and reporting requirements.

8. The defendant Company is ordered to pay to Messrs. Cathey, Dodd, Hill, Walker, Drakeford, Robinson and Hames equitable back pay for any monetary losses they have suffered. If the parties have not or cannot agree on dollar amounts for each individual within thirty (30) days from the filing of this Order, they should so advise the Court. *Moody v. Albemarle Paper Co.*, 474 F.2d 134 (4th Cir. 1973); *Pettway v. American Cast Iron Pipe Co., supra.*

9. The defendant Company is hereby ordered to pay to counsel for the plaintiffs their costs including reasonable attorneys fees, court costs and expenses. In its discretion, the Court concludes no costs including attorney fees shall be taxed against the defendant unions. Counsel for the Company and the plaintiffs shall advise the Court if they are not able to agree on a monetary payment for costs and fees.

10. While the current Maintenance contract does not provide for "carryover seniority" the Court will not order relief with respect to that agreement since no plaintiffs or class members seek to move from jobs within the Maintenance agreement to jobs within the Road agreement.

11. This order is final and binding on all class members who received notice of this action. It is not binding with respect to those individuals who, in writing, have heretofore sought exclusion from this case.

12. The Court retains jurisdiction to enter further orders consistent with this decree and to monitor the future employment programs and policies of the defendants for a reasonable time.